**Affirmed and Opinion Filed June 10, 2024**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-22-01184-CV**
_____

**WILLIAM E. ROBINSON, JR., Appellant**
**V.**
**BORAL WINDOWS LLC F/K/A HEADWATERS WINDOWS, LLC,**
**HEADWATERS WINDOWS, LLC N/K/A BORAL WINDOWS LLC, AND**
**HEADWATERS INCORPORATED, Appellees**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-16397**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Garcia
Opinion by Justice Partida-Kipness

This case involves a contract dispute following the 2016 purchase of William

E. Robinson, Jr.'s window-manufacturing businesses[1] by appellee Headwaters

Windows, LLC (Headwaters Windows). At trial, the trial court granted Appellees'

motion for directed verdict as to Robinson's counterclaims. Robinson appeals that

order, and we affirm.

_____

[1] Krestmark Industries, L.P., Crest Vinyl Extrusions, LLC, and Legacy Vinyl Windows, LP
(collectively, Krestmark or the Krestmark Entities).

## BACKGROUND

In 2016, Headwaters Windows[2] purchased Krestmark for over $240 million. At that time, Headwaters Incorporated was the parent company of Headwaters Windows. After the sale, Robinson was employed by Headwaters Windows in the position of President. His employment agreement included non-solicitation and non-competition provisions. On May 8, 2017, Boral Industries (Boral) acquired Headwaters Windows and Headwaters Incorporated. Boral terminated Robinson's employment on May 22, 2017. In the underlying proceeding, Boral Windows, LLC f/k/a Headwaters Windows, LLC (Boral Windows), sued Robinson for purportedly violating the covenants not to compete in his employment agreement. Robinson asserted various counterclaims, some of which were dismissed before trial. After the close of evidence, the trial court granted Appellees' motion for directed verdict on Robinson's remaining counterclaims. Although we affirm the directed verdict on purely legal grounds, a brief discussion of the underlying transactions and relevant agreements[3] is necessary for context.

## I. Headwaters Windows Acquires Krestmark

In 2016, Krestmark marketed itself to potential buyers through a retained financial advisor, Duff & Phelps Securities, LLC (D&P). To protect Krestmark's

---

[2] Headwaters Windows was created in July 2016 to purchase Krestmark.

[3] The agreements and other documents relevant to our decision are (1) the Confidentiality Agreement and two letters of intent signed before Headwaters Windows acquired Krestmark, (2) Robinson's August 19, 2016 Employment Agreement with Headwaters Windows, and (3) the Release and Waiver signed by Robinson on June 29, 2017, following his termination.

identity, D&P's marketing materials identified Krestmark by a code name, LoneStar, and designated the acquisition opportunity "Project LoneStar." To obtain Krestmark's identity and conduct negotiations, the Treasurer of Headwaters Incorporated signed a Confidentiality Agreement on April 14, 2016. In paragraph 10 of the Confidentiality Agreement, Headwaters Incorporated agreed not to disclose certain information related to the proposed purchase of Krestmark without the prior written consent of Krestmark:

> Without the Company's[4] prior written consent, you shall not, and you shall direct your Representatives not to, (i) disclose to any Person the fact that the Company has made the Confidential information available to you, that you are considering a proposed Transaction or that discussions or negotiations are taking place or have taken place concerning a proposed Transaction, or any of the terms:, conditions or other facts with respect to any such Transaction, including the status and/or timing thereof, or (ii) make any contact of any nature regarding a proposed Transaction (including inquiries or requests concerning Confidential Information) with any supplier, customer, labor union, landlord, lessor, bank or other lender of or to the Company or any of its affiliates.

On June 29, 2016, Headwaters Incorporated submitted a Letter of Intent (Original LOI) to D&P in which Headwaters Incorporated expressed its intent to acquire Krestmark for a purchase price of $240 million. The Original LOI included statements concerning anticipated employment agreements with Robinson and Krestmark's management team. On July 25, 2016, Headwaters Incorporated submitted a Second Letter of Intent (Second LOI) to Krestmark Industries, L.P. The

---

[4] "Company" referred to the Krestmark Entities.

Second LOI again reflected a purchase price of $240 million. It also included statements concerning Headwaters Incorporated's plans to continue to employ Krestmark's employees and management team following the acquisition and to require non-competition and non-solicitation agreements from them. The parties also agreed "to keep confidential the existence, status and terms of this LOI, the proposed transaction and the negotiations relating thereto." They further agreed the approval of Headwaters Incorporated, Headwaters Windows, and Krestmark was required to issue or otherwise disseminate a "press release, notice to any third party or other publicity concerning the proposed transaction . . ." A week later, on August 1, 2016, Robinson as the Krestmark Entities' President and Owner, Headwaters Windows as Purchaser, and Headwaters Incorporated as Purchaser's Parent Corporation signed an Asset Purchase Agreement (APA) and the deal closed thereafter.

## II.  The Employment Agreement

Robinson and Headwaters Windows entered an Employment Agreement on August 19, 2016, under which Robinson accepted the position of President. The Employment Agreement provided for a five-year term of employment, a $310,000 base salary, and short term and long-term incentive compensation plans. The Employment Agreement included payment provisions in the event Robinson's employment was terminated. One of those provisions conditioned Robinson's entitlement to a cash severance and COBRA reimbursement on his execution and delivery of an effective release within forty-five days of termination. The release

was required to be "in substantially the form" of an unsigned release attached as an exhibit to the Employment Agreement.

The Employment Agreement also included several "Employment and Post-Termination Covenants," such as non-solicitation and non-competition covenants, which would remain in effect for three years following the termination of Robinson's employment with or service to Headwaters Windows. Regarding the non-competition covenant, Robinson agreed to not work for a competitor during the three-year, post-termination restricted period. As consideration for Robinson's agreement to the non-competition covenant, he was to be paid $50,000 annually in addition to his salary and other compensation.

## III.    Boral Industries Acquires Headwaters Incorporated

Boral expressed interest in acquiring Headwaters Incorporated during a July 25, 2016 meeting between Mike Kane, Boral Limited's[5] Chief Executive Officer, and Kirk Benson, Headwaters Incorporated's Chief Executive Officer. Benson testified he did not know the purpose of the meeting when he arrived. During the meeting, Kane explained Boral was interested in acquiring Headwaters Incorporated. Benson told Kane that Headwaters Incorporated was not for sale, and any sales proposal should be submitted in writing. The counterclaims at issue on appeal relate to events allegedly occurring at the July 25, 2016 meeting. Specifically,

---

[5] Boral Industries, Inc. (Boral) is owned by Boral Limited, a public-traded Australian company. Boral is the U.S. arm of Boral Limited.

Robinson's contention Benson breached the Confidentiality Agreement and the two LOIs by disclosing information concerning the Krestmark acquisition and the negotiations surrounding it to Kane. Benson maintained the only information he provided to Boral "was the information that Krestmark gave us the permission to include in the press release." Headwaters Incorporated issued that press release and publicly disclosed the Krestmark acquisition on August 2, 2016, a week after Benson's meeting with Kane.

On May 8, 2017, nine months after the Krestmark acquisition, Headwaters Incorporated was acquired by and became a subsidiary to Boral. Headwaters Windows continued to be directly and wholly owned by Headwaters Incorporated. On September 1, 2017, Headwaters Windows changed its name to Boral Windows LLC (Boral Windows).

## IV.  Termination of Robinson's Employment

On May 16, 2017, following Boral's acquisition of Headwaters Incorporated, Boral informed Robinson by letter of changes to his employment status. Specifically, as of May 22, 2017, Robinson would no longer serve in the position of President. Instead, he would hold the position of Senior Advisor – Windows and would report to Joel Charlton, Group President – Windows, Energy and Innovation. Then, on May 22, 2017, Charlton terminated Robinson's employment effective immediately.

To receive cash severance and COBRA reimbursement, the Employment Agreement required Robinson to execute a release and waiver within forty-five days

of his termination. Robinson signed the Release and Waiver on June 29, 2017. In it, Robinson released and waived the following:

> . . . ***any and all*** actions, causes of action, suits, claims, obligations, liabilities, debts, demands, contentions, damages, punitive damages, compensatory damages, judgments, levies and executions of any kind whatsoever, whether in law or in equity, known or unknown, . . . ***from the beginning of time to the present, including for any and all acts or omissions occurring to date*** regardless of whether or not the cause of action arising therefrom has yet arisen or may arise in the future. ***This Release and Waiver specifically includes without limitation all matters arising out of, related to, in connection with, or resulting from, the Employment Agreement, Executive's employment with the Company and the termination of Executive's employment relationship.*** This Release and Waiver ***specifically includes without limitation any and all*** claims arising in tort (expressly including intentional torts) or contract or under any federal, state, county, municipal or other local statute, law or ordinance whatsoever.

(emphasis added). In addition, the Release and Waiver stated it "specifically includes without limitation any and all claims based on" alleged employment discrimination. The Release and Waiver also set out four exclusions:

> ***This Release and Waiver excludes only (and such rights and obligations shall remain in effect in accordance with their terms):*** (i) any indemnification rights the Executive has with respect to a claim by any third party against the Executive in his official capacity with the Company; (ii) any severance payments owed by the Company to the Executive as expressly provided by the Employment Agreement; (iii) any vested, nonforfeitable benefits to which the Executive or a beneficiary of the Executive may be entitled under the terms and provisions of any employee benefit plan of the company which have accrued as of the separation date (including without limitation rights to COBRA continuation coverage) and ***(iv) all rights, claims, and causes of action pursuant to the Asset Purchase Agreement (including without limitation all rights with regard to the Indemnity Escrow Agreement as defined therein) and that certain Retention Bonus Agreement,*** dated August 1, 2016, . . .

(emphasis added). Robinson received his contractually-mandated severance totaling nearly $400,000.

## V. The Underlying Lawsuit and Trial

Appellees contend they discovered Robinson was violating the non-compete provision of the Employment Agreement about a year after his termination. The underlying proceeding began when Boral Windows sued Robinson and asserted claims alleging he violated the covenants not to compete of the Employment Agreement. The jury found against Appellees on those claims. They are not at issue in this appeal.

Robinson asserted counterclaims and third-party claims against Appellees. By the time the case went to trial, four of Robinson's counterclaims remained at issue. First, Robinson contended Headwaters Incorporated and Headwaters Windows breached the Confidentiality Agreement and the two LOIs by disclosing to Boral information concerning the negotiations with and acquisition of the Krestmark Entities. Next, he asserted a claim against Boral for tortious interference with contracts. Robinson maintained Boral "maliciously, willfully, and intentionally interfered" with the Confidentiality Agreement, the letters of intent, the APA, and the Employment Agreement "by encouraging/facilitating Headwaters to reveal its acquisition of Krestmark . . . ." Robinson further pleaded that Boral intended to immediately terminate and replace Robinson after acquiring Headwaters Incorporated. Finally, Robinson asserted a conspiracy claim against Appellees. He

contended they conspired to have Headwaters Windows purchase Krestmark "at less than fair market price, and to replace and terminate Robinson" following Boral's acquisition of Headwaters Incorporated.

After both sides rested and closed, Appellees moved for directed verdict on Robinson's remaining counterclaims. After lengthy arguments from counsel and an extended discussion between the trial judge and counsel, the trial judge took the motion for directed verdict under advisement and stated she would issue her ruling that evening via e-mail. The record does not include an e-mail ruling. Rather, the trial judge announced her ruling on the record the following morning, stating:

> In addition, counsel, the Court needs to put on the record the Court's ruling on the directed verdict presented by the Boral parties yesterday. There was a directed verdict presented relating to the counterclaims on a number of grounds, including but not limited to, the statute of limitations and waiver. And the Court grants that directed verdict on those counterclaims.

After closing arguments, the case was submitted to the jury. In a non-unanimous verdict, the jury found in favor of Robinson on Appellees' claims against him.

Following trial, Robinson filed a motion for reconsideration of the directed verdict order and a motion for judgment on the verdict. The trial court denied the motion for reconsideration by written order on September 2, 2022, and entered final judgment on October 6, 2022. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's decision to grant or deny a motion for a directed verdict under the legal sufficiency standard of review. *Mikob Props., Inc. v. Joachim*,

468 S.W.3d 587, 594 (Tex. App.—Dallas 2015, pet. denied). We consider all the evidence in a light most favorable to the nonmovant, and we resolve all reasonable inferences that arise from the evidence admitted at the trial in the nonmovant's favor. *Cook v. Kovatch*, No. 05-22-00347-CV, 2024 WL 301920, at *8 (Tex. App.—Dallas Jan. 26, 2024, no pet.) (mem. op.) (citing *Mikob Props.*, 468 S.W.3d at 594). In our review, we determine whether there is any evidence of probative force to raise a fact issue on the question presented. *Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.—Dallas 2006, no pet.).

## APPLICABLE LAW

A release is a contractual arrangement that operates as a complete bar to any later action based upon matters covered in the release. *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014, pet. denied); *Schomburg v. TRW Vehicle Safety Sys., Inc.*, 242 S.W.3d 911, 913 (Tex. App.—Dallas 2008, pet. denied). A release is subject to the rules of contract construction, including the rules related to ambiguity. *Leighton v. Rebeles*, 399 S.W.3d 721, 725 (Tex. App.—Dallas 2013, no pet.); *D.R. Horton–Tex., Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 226 (Tex. App.—Fort Worth 2013, no pet.). In construing a release, as with other contracts, our primary task is to determine the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We must consider the entire writing in order to harmonize and give effect to the provisions of

the contract so that none will be rendered meaningless. *Id.* Terms are given their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used terms in a technical or different sense. *ECF N. Ridge Assocs., L.P. v. ORIX Cap. Mkts., L.L.C.*, 336 S.W.3d 400, 407 (Tex. App.—Dallas 2011, pet. denied).

To release a claim effectively, the releasing instrument must "mention" the claim to be released. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 697–98 (Tex. 2000) (discussing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)); *McCullough*, 435 S.W.3d at 885. Claims that are not clearly within the subject matter of the release are not discharged, even if they exist when the release is executed. *Henry v. Masson*, 333 S.W.3d 825, 844 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (first citing *Brady*, 811 S.W.2d at 938, and then citing *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)). However, it is not necessary for the parties to anticipate and explicitly identify every potential cause of action relating to the subject matter of the release. *Keck, Mahin & Cate*, 20 S.W.3d at 698; *McCullough*, 435 S.W.3d at 885. Rather, "a valid release may encompass unknown claims and damages that develop in the future." *Keck, Mahin, & Cate*, 20 S.W.3d at 698; *see also McCullough*, 435 S.W.3d at 885. Further, although the "mention" requirement does not bar general, categorical releases, such releases are to be narrowly construed. *Brady*, 811 S.W.2d at 938; *McCullough*, 435 S.W.3d at 885. We also construe

releases in light of the facts and circumstances surrounding the execution of the release. *Naik v. Naik*, 438 S.W.3d 166, 175 (Tex. App.—Dallas 2014, no pet.) (citing *Brady*, 811 S.W.2d at 939).

## ANALYSIS

In three issues, Robinson appeals the directed verdict dismissing his counterclaims against Headwaters Incorporated and Headwaters Windows for breach of the Confidentiality Agreement, the Original LOI, and the Second LOI, and against Boral for tortious interference with contracts.[6] Robinson argues the trial court erred in granting the directed verdict because the counterclaims (1) were not barred by the statute of limitations, (2) were not subject to the Release and Waiver, and (3) were not barred by the APA's "No Consequential Damages" provision.

In seeking a directed verdict on Robinson's counterclaims based on the Release and Waiver, Appellees argued the counterclaims were released and waived under the Release and Waiver's broad language releasing "any and all claims" and were not subject to any of the four limited exclusions to the otherwise global release and waiver. We agree, and because we conclude the counterclaims were subject to the Release and Waiver, we begin and end our analysis with Robinson's second issue.

---

[6] The trial court also granted Appellees' motion for directed verdict on Robinson's conspiracy counterclaim. Robinson does not appeal that ruling.

**I.    The Counterclaims were not Subject to Any of the Release and Waiver's Four Exclusions**

As discussed above, the Employment Agreement conditioned Robinson's entitlement to a cash severance and COBRA reimbursement on Robinson executing and delivering "an effective release" within forty-five days of his termination. He signed the Release and Waiver on June 29, 2017, following his termination. In addition to waiving a variety of potential claims related to employment discrimination, the Release and Waiver also released and waived the following:

> . . . ***any and all*** actions, causes of action, suits, claims, obligations, liabilities, debts, demands, contentions, damages, punitive damages, compensatory damages, judgments, levies and executions of any kind whatsoever, whether in law or in equity, known or unknown, . . *. **from the beginning of time to the present, including for any and all acts or omissions occurring to date*** regardless of whether or not the cause of action arising therefrom has yet arisen or may arise in the future. ***This Release and Waiver specifically includes without limitation all matters arising out of, related to, in connection with, or resulting from, the Employment Agreement, Executive's employment with the Company and the termination of Executive's employment relationship.*** This Release and Waiver ***specifically includes without limitation any and all*** claims arising in tort (expressly including intentional torts) or contract or under any federal, state, county, municipal or other local statute, law or ordinance whatsoever.

(emphasis added). The Release and Waiver went on to state it "excludes only" the following four categories of claims "(and such rights and obligations shall remain in effect in accordance with their terms):"

(i)     Indemnification rights with respect to a third-party claim against Robinson in his official capacity;

(ii)    Severance payments owed to Robinson as expressly provided by the Employment Agreement;

(iii)  Any vested, nonforfeitable benefits to which Robinson or his beneficiary may be entitled under the terms and provisions of any employee benefit plan, and

(iv)  "[A]ll rights, claims, and causes of action pursuant to the Asset Purchase Agreement (including without limitation all rights with regard to the Indemnity Escrow Agreement as defined therein) and that certain Retention Bonus Agreement, dated August 1, 2016, by and among Krestmark Industries, L.P., a Texas limited partnership; Crest Vinyl Extrusions, LLC, a Texas limited liability company, Legacy Vinyl Windows, LP, a Texas limited partnership, Executive, and Company."

It is undisputed the counterclaims did not fall under the first three exclusions. Robinson invoked the fourth exclusion, arguing the counterclaims were "rights, claims, and causes of action pursuant to the" APA. However, when faced with Appellees' contention that any claims brought pursuant to the APA were barred by the APA's "No Consequential Damages" provision,[7] Robinson's counsel changed course and conceded the counterclaims were not brought pursuant to the APA because they involved agreements that were separate from the APA. This was consistent with Robinson's trial testimony in which he stated the counterclaims were not brought under the APA. This is also consistent with Texas law. *See, e.g.*, *Cornerstone Staffing Sols., Inc. v. Valtech Sols., Inc.*, No. 05-19-00093-CV, 2020 WL 6304993, at *4 (Tex. App.—Dallas Oct. 28, 2020, no pet.) (mem. op.) (explaining "pursuant to" means "in compliance with," "in accordance with," "as

---

[7] Section 11.8 of the APA provided "no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages . . . relating to the breach or alleged breach hereof . . . ."

–14–

authorized by," or "in carrying out.") (first citing "Pursuant to, BLACK'S LAW DICTIONARY (8th ed. 2004), and then citing *Baty v. Bowen Miclette & Britt, Inc.*, 423 S.W.3d 427, 440 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (according to the supreme court, "pursuant to" means "in carrying out") (citing *Syntax, Inc. v. Hall*, 899 S.W.2d 189, 191–92 (Tex. 1995))). Because the counterclaims were not brought "pursuant to" the APA, they were not subject to the fourth exclusion. Under this record, we conclude as a matter of law that Robinson's counterclaims were not subject to any of the four exclusions found in the Release and Waiver.

But this does not end our inquiry. We must also determine whether the counterclaims are subject to the Release and Waiver.

## II. Scope of the Release and Waiver

Robinson's arguments in opposition to applying the Release and Waiver to his counterclaims comprise three categories. First, he contends the Release and Waiver applied only to the Employment Agreement and, therefore, claims concerning separate agreements such as the Confidentiality Agreement and the LOIs were not subject to the Release and Waiver. Second, he argues the counterclaims were not "mentioned" in the Release and Waiver and, therefore, are not clearly within its subject matter. Third, Robinson maintains the Release and Waiver did not apply to claims against Headwaters Incorporated and Boral because those entities were not named in the Confidentiality Agreement or the Release and Waiver. Appellees disagree and maintain the Release and Waiver's plain language broadly

–15–

waived and released any and all claims not specifically excluded. We agree with Appellees and conclude Robinson's counterclaims fell within the broad language of the Release and Waiver.

## A. The Release and Waiver is not limited to the Employment Agreement

In his opening brief, Robinson insists the Release and Waiver "only applied to 'matters arising out of, related to, in connection with, or resulting from, the Employment Agreement," and "only claims for breach of the Employment Agreement" are barred by it. In support, Robinson cites to the following three sentences in the Release and Waiver referencing the Employment Agreement and the release of claims related to allegations of employment discrimination:

> This Release and Waiver specifically includes without limitation all matters arising out of, related to, in connection with, or resulting from, the Employment Agreement, Executive's employment with the Company and the termination of Executive's employment relationship.
>
> ***
>
> This Release and Waiver specifically includes without limitation any and all claims based on wrongful discharge, discrimination of any kind whatsoever (including without limitation based upon race, sex, age, religion, national origin, handicap, or disability), illegal, improper or otherwise prohibited employment practices, and for any employment compensation or benefits whatsoever. This Release and Waiver specifically includes, without limitation, any and all claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act, the Equal Pay Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and any analogous Texas laws.

(underlining added by Robinson). In his reply brief, Robinson also contends the Release and Waiver "recites that it applied only to employment claims" by including the following language after the four exclusions:

> Nothing contained in this Release and Waiver limits Executive's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Governmental Agencies").

Robinson's arguments are misleading. The sentences referenced by Robinson include no language restricting the scope of the Release and Waiver to only claims arising from the Employment Agreement or claims alleging breaches of the Employment Agreement. Moreover, Robinson fails to cite or otherwise acknowledge the language immediately preceding the sentences he relies on, which plainly state the Release and Waiver is not limited as Robinson suggests:

> Executive . . . hereby irrevocably and unconditionally waives, releases, acquits, and forever discharges **_any and all_** actions, causes of action, suits, claims, obligations, liabilities, debts, demands, contentions, damages, punitive damages, compensatory damages, judgments, levies and executions of any kind whatsoever, whether in law or in equity, known or unknown, against the Company . . . **_from the beginning of time to the present, including for any and all acts or omissions occurring to date_** regardless of whether or not the cause of action arising therefrom has yet arisen or may arise in the future.

(emphasis added). The plain language of the Release and Waiver contradicts Robinson's interpretation of its scope. We conclude the plain language of the Release and Waiver does not limit it to "matters arising out of, related to, in connection with, or resulting from, the Employment Agreement."

–17–

Robinson also asserts "Boral admitted" in its pleadings that the Release and Waiver applied only to the Employment Agreement. He provides multiple record cites in support. But nothing cited by Robinson supports his contention that Boral made any such admission.

The record citations consist of selected snippets of arguments and evidence submitted in support of Appellees' motions for summary judgment and their response to Robinson's summary judgment motion, one sentence from an affidavit submitted with summary judgment briefing, and one piece of trial testimony. Appellees did not reference the summary judgment briefing, summary judgment evidence, or the cited trial testimony in support of their motion for directed verdict, and Robinson did not reference it in opposition to the motion. The trial court, therefore, was not asked to consider those pleadings and testimony when deciding the motion for directed verdict. Further, in the motion for directed verdict, Appellees argued the Release and Waiver was not limited to claims related to the Employment Agreement. As such, the briefing excerpts and cited testimony provide no legal support for Robinson's allegation that Boral admitted the Release and Waiver was limited in scope.

Moreover, none of the pleadings or testimony cited by Robinson addressed either the scope of the Release and Waiver or affirmatively limited its scope. Rather, the cited pleadings and testimony merely asserted facts and arguments concerning specific aspects of the Release and Waiver and Appellees' arguments. For example,

the language cited from the summary judgment briefing consists of statements that Robinson signed the Release and Waiver, declared he received all he was entitled to under the Employment Agreement, released and waived any claims concerning the Employment Agreement and his employment, and received a generous severance by doing so. Robinson cites nothing resembling an admission that the Release and Waiver is limited to the Employment Agreement and claims related to that agreement.

The same is true for the testimony cited by Robinson. The following affidavit testimony of Boral's Vice President of Human Resources, Tommy Balas, was cited as proof of an admission by Boral: "On or about June 29, 2017, Mr. Robinson executed a release and waiver averring to the fact that he received what he was entitled to under the Employment Agreement." Although this statement references one averment made by Robinson in the Release and Waiver, Balas did not state this was the only averment made by Robinson as he suggests.

Similarly, Robinson's reliance on Ernest McLean's trial testimony is unavailing. McLean is Boral's former Vice President and Corporate Secretary. On redirect examination, Appellees' counsel posed the following question:

> Let's look at a few provisions of the employment agreement and what happened to this employment agreement after the parties signed Exhibit J45, that termination letter?

McLean responded:

> This agreement would normally terminate, depending on the terms of the termination letter and the termination letter had as part of it a release

and waiver. And the release was where Mr. Robinson released any other claims that he would have basically anywhere connected with his employment. He would no longer have any rights under this employment agreement.

This does not constitute an admission by Boral "that the Release and Waiver applied only to the Employment Agreement" as Robinson contends. McLean was not asked if the Release and Waiver was limited to claims under the Employment Agreement, and he did not say it was so limited. In fact, his testimony included his belief the Release and Waiver released any claims related to Robinson's employment in general, not only claims related to the employment agreement. Robinson's arguments are without merit. We conclude the Release and Waiver was not limited to claims arising out of the Employment Agreement or for breaches of that agreement. *See Kalyanaram v. Burck*, 225 S.W.3d 291, 299–300 (Tex. App.—El Paso 2006, no pet.) (holding agreement releasing "any and all claims . . . known or unknown, suspected or unsuspected, fixed or contingent . . . including those raised in the Lawsuits and/or during or out of the employment relationship . . ." released claims "much further than just claims or causes of action arising out of the employment relationship.").

### B. The Release and Waiver was broad enough for the counterclaims to be within its subject matter.

Robinson next argues the counterclaims were "not clearly within the subject matter" of the Release and Waiver because the Confidentiality Agreement and the LOIs were not mentioned in the Release and Waiver. Robinson relies on *Victoria*

*Bank & Trust Co. v. Brady*, 811 S.W.2d 931 (Tex. 1991) to support his argument. We conclude *Brady* is inapplicable because the release in *Brady* included limiting language not present here.

In 1983, Marlyn Brady (Brady) formed a partnership with Fancher Cattle Company, Inc. (Cattle Company) to buy and sell cattle. *Brady*, 811 S.W.2d at 933. Bill Fancher owned Cattle Company. *Id.* Victoria Bank & Trust Company (the Bank) agreed to supply the necessary funding for the venture but required the loan be secured with Brady's ranch as collateral. *Id.* Brady and Cattle Company executed a promissory note to meet the Bank's requirements (the Brady-Cattle Company Note). *Id.* In 1984, the Bank agreed to renew and extend the Brady-Cattle Company Note and increase the amount of the line of credit for Brady and Cattle Company. *Id.* In July 1985, the renewal note was declared to be in default and the Bank posted Brady's ranch for foreclosure. *Id.* The Bank also pursued Cattle Company and Fancher as guarantors. *Id.* Brady sued the Bank to stop the foreclosure and, at the temporary injunction hearing, Brady, Fancher, Cattle Company, and the Bank reached a settlement agreement (the Brady-Cattle Company Settlement Agreement). *Id.* at 934. Under the Brady-Cattle Company Settlement Agreement, Fancher and the Cattle Company released the Bank "from any and all claims and causes of action . . . directly or indirectly attributable to the above described loan transaction." *Id.* at 934, 938. The "above described loan transaction" referred to the Brady-Cattle Company Note:

> WHEREAS, Fancher Cattle Company, Inc. and Marlyn Brady executed a promissory note (revolving line of credit) dated June 20, 1984, in the maximum amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00), payable to the order of Victoria Bank & Trust Company....

*Id.* at 938-39.

In the proceeding at issue in *Brady*, the claims and causes of action asserted by Fancher and Cattle Company did not relate to the Brady-Cattle Company Note. *Brady*, 811 S.W.2d at 939. Rather, their claims arose directly out of the Bill Richardson cattle transaction, which was a transaction separate from and unrelated to the Brady-Cattle Company Note. *Id.* The Bank argued, however, that those claims were nonetheless subject to the release in the Brady-Cattle Company Settlement Agreement. *Id.* The *Brady* court disagreed, concluding the Bill Richardson cattle transaction was "not mentioned or clearly within the subject matter of" the Brady-Cattle Company settlement agreement because that agreement limited the release to claims "directly or indirectly attributable to the above described loan transaction" (i.e., to the Brady-Cattle Company Note). *Id.* Because the Bill Richardson cattle transaction was not related to the Brady-Cattle Company Note, it was not related to "the above described loan transaction" and, therefore, not released or waived. *Id.*

Here, the Release and Waiver includes no limiting language like the language in the Brady-Cattle Company Settlement Agreement. On the contrary, it is a general release with specific exclusions not applicable here. *See RTKL Assocs., Inc. v. Transcon. Realty Invs., Inc.*, No. 05-11-00786-CV, 2012 WL 6114887, at *4–5 (Tex.

App.—Dallas Dec. 10, 2012, no pet.) (mem. op.) (concluding *Brady* inapplicable in case involving general release). Moreover, since *Brady*, the Texas Supreme Court has clarified the holding of *Brady* and fine-tuned the criteria for being "mentioned" in and subject to a release. *See Memorial Medical Center of East Texas v. Keszler*, 943 S.W.2d 433 (Tex. 1997) (per curiam); *see also Keck, Mahin & Cate*, 20 S.W.3d at 696. Robinson's Release and Waiver is analogous to those post-*Brady* cases.

In *Keszler*, Memorial brought a "corrective action" against Keszler and revoked his privileges after he was found guilty of tampering with government records. 943 S.W.2d at 434. Keszler sued Memorial and the parties' reached a settlement. The Settlement Agreement included the following release:

> KESZLER shall release and forever discharge MEMORIAL . . . from any and all claims, causes of action, demands, known or unknown, which KESZLER has or may have and which have not accrued, arising out of and in connection with the corrective action taken against KESZLER by MEMORIAL and any other actions KESZLER might have against MEMORIAL for any such action taken against KESZLER.

*Id.* The parties also executed a Release, which provided:

> Keszler . . . does hereby RELEASE, ACQUIT and FOREVER DISCHARGE [Memorial] . . . from any and all claims, demands, actions, and causes of action of any kind whatsoever . . . which [Keszler] has or might have, known or unknown, now existing or that might arise hereafter or which have not yet accrued, ***directly or indirectly attributable to or in any way arising out of corrective action taken by [Memorial] against [Keszler] and any other matter relating to [Keszler's] relationship with [Memorial],*** including but not limited to his relationship as a member of the staff or as a physician having clinical privileges, ***it being the intent of [Keszler] to release all claims of any kind or character which he might have against [Memorial]*** ....

–23–

*Id.* (emphasis added). After the settlement, Keszler sued Memorial for damages for injuries he suffered because of exposure to a toxic sterilizing agent Memorial used during his employment. *Id.* The supreme court stated the release must "mention" the claim, but it disagreed with the court of appeals' holding the claim must be specifically enumerated to be released. *Id.* at 435. The supreme court concluded the claim was "mentioned" in the release because Keszler agreed to release all claims relating to his relationship with Memorial, and his claim for toxic exposure during his employment at Memorial was related to his relationship with Memorial. *Id.*

Similarly, in *Keck*, the Texas Supreme Court considered a release that applied to "all demands, claims or causes of action" between the parties. 20 S.W.3d at 696. There, the Texas Supreme Court considered whether an insured's[8] release of attorney's fees was limited to unpaid fees or applied to all malpractice claims attributable to legal services rendered during a specified period. *Id.* at 697; *see also Garza v. Ford Motor Co.*, 423 S.W.3d 442, 449 (Tex. App.—San Antonio 2013, no pet.) (discussing *Keck*). The dispute centered on the recitals and the following two paragraphs in the release. *Keck*, 20 S.W.3d at 697. The recitals at the beginning of the release stated KMC performed legal services for Granada for which Granada owes KMC "a substantial sum for outstanding and unpaid invoices for professional legal services rendered," KMC and Granada "desire to resolve the issue of the

---

[8] The insured, Granada Food Corporation (Granada) retained the law firm of Keck, Mahin & Cate (KMC) as its attorneys in the underlying dispute. *Keck*, 20 S.W.3d at 695.

Unpaid Fees to their mutual satisfaction," and "in exchange for the mutual promises, agreements and releases herein contained, KMC and Granada do hereby agree as follows:[.]" Paragraphs 1 and 2 immediately follow and set out the consideration to Granada and to KMC for the agreement.

In paragraph 1, KMC forgives Granada for all unpaid legal fees for services rendered between June 1, 1988 and April 1, 1992:

> 1. KMC hereby releases, and by these presents does hereby release, acquit and forever discharge Granada, its agents, servants, employees, officers, directors, affiliates and all persons, natural or corporate, in privity with them or any of them from any demands, claims or causes of action of any kind which KMC had or might have, directly or indirectly attributable to the Unpaid Fees owed to KMC by Granada for professional legal services rendered between June 1, 1988 and April 1, 1992, it being intended to release Granada from any obligation to pay such Unpaid Fees.

Then in paragraph 2, Granada releases all claims it has, or may have, against KMC in connection with KMC's legal services to Granada during the same time period:

> 2. Granada hereby releases and by these presents does hereby release, acquit and forever discharge KMC, its agents, servants, employees, partners, affiliates and all persons, natural or corporate, in privity with it, from any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly attributable to the rendition or [sic] professional legal services by KMC to Granada between June 1, 1988 and April 1 1992.

Relying on *Brady*, the court of appeals concluded the release did not release KMC from the legal malpractice claims because the release was limited to claims for unpaid fees. In so holding, the court of appeals construed the release narrowly and

concluded the references to "Unpaid Fees" in the recitals and paragraph 1 were an implied limitation on the claims mentioned and released in paragraph 2.

KMC challenged the court of appeals' decision and argued paragraph 2 set out KMC's consideration and released any and all claims Granada may have against KMC directly or indirectly attributable to the legal services provided by KMC. *Id.* at 697. The Texas Supreme Court agreed with KMC and concluded *Brady* did not control the construction of the release at issue:

> The present release is clearly broader than the one in *Brady*. It is not expressly limited to a specific claim or transaction but rather purports to cover "all demands, claims or causes of action of any kind whatsoever." Nothing in *Brady* forbids such a broad-form release. *Brady* simply holds that the release must "mention" the claim to be effective. It does not require that the parties anticipate and identify each potential cause of action relating to the release's subject matter.

*Id.* at 698 (internal citations omitted). The court concluded the release was sufficient to release all legal malpractice claims against KMC attributable to legal services rendered to Granada "between June 1, 1988 and April 1, 1992." *Id.* at 697. The *Keck* court also rejected the court of appeals' limitation of the release to issues related to Unpaid Fees:

> The court of appeals' construction imposes a symmetry that is simply absent from the agreement's language. While the recitals in this release are concerned primarily with the issue of Granada's unpaid legal fees, they do not convey an intent to limit the consideration to KMC for the forgiveness of those fees. The recitals merely state the parties' general desire "to resolve the issue of Unpaid Fees to their mutual satisfaction." Paragraphs 1 and 2 then explain the parties' mutual satisfaction—KMC forgives all unpaid legal bills; Granada releases all claims relating to KMC's legal services rendered during a specific time period. Because the release forgives KMC for any legal malpractice it may have

committed during this period, the court of appeals erred in holding to the contrary.

*Keck*, 20 S.W.3d at 698.

The supreme court's analysis in *Keszler* and *Keck* applies equally here. Like the releases in those cases, the Release and Waiver is broadly written, not expressly limited to a specific claim or transaction, excludes only specifically-enumerated claim not at issue here, and affirmatively states Robinson released the following:

> . . . any and all actions, causes of actions, suits, claims, . . . of any kind whatsoever, whether in law or in equity, known or unknown, against the Company . . . from the beginning of time to the present, including for any and all acts or omissions occurring to date regardless of whether or not the cause of action arising therefrom has yet arisen or may arise in the future.

And, like in *Keszler*, Robinson agreed to the broad release and specifically acknowledged the scope of the document:

> However, based on Executive's release of claims set forth in this Release and Waiver, Executive understands that Executive is releasing all claims and causes of action that Executive might personally pursue or that might be pursued in Executive's name and, to the extent permitted by applicable law, Executive's right to recover monetary damages or obtain injunctive relief that is personal to Executive in connection with such claims and causes of action.

This agreement to the broad release and waiver language and the timing of Robinson's execution of the Release and Waiver (i.e., after his termination) further confirm the broad scope of the Release and Waiver. *See Keszler*, 943 S.W.2d at 435 (concluding claim was mentioned in the release where Keszler agreed to release all claims relating to his relationship with Memorial, and his claim for toxic exposure

–27–

during his employment at Memorial was related to his relationship with Memorial). In light of *Keszler*, *Keck*, and their progeny, the plain language of the Release and Waiver can be interpreted only one way; to cover any and all claims against Appellees not specifically excluded. *See Keszler*, 943 S.W.2d at 435; *see also Keck*, 20 S.W.3d at 698; *Shanley v. First Horizon Home Loan Corp.*, No. 14-07-01023-CV, 2009 WL 4573582, at *10–11 (Tex. App.—Houston [14th Dist.] Dec. 8, 2009, no pet.) (similarly-worded release was "not expressly limited to a specific claim or transaction . . . .").

Although the Confidentiality Agreement and the LOIs were not mentioned in the Release and Waiver, they were not specifically excluded from its scope. Had the parties intended to exclude claims related to those agreements, they could have specifically excluded them as they did claims related to the Indemnity Escrow Agreement and the APA. The Indemnity Escrow Agreement was a component of and attached to the APA, whereas the Confidentiality Agreement and the LOIs were separate, distinct documents. By including the Indemnity Escrow Agreement in the fourth exclusion but not including the Confidentiality Agreement and the LOIs, the parties arguably intended only the APA and documents attached to the APA to be excluded from the Release and Waiver. The Confidentiality Agreement and the LOIs were freestanding documents and, thus, not excluded.

We conclude any and all claims brought by Robinson against Appellees, except for the limited exclusions not applicable here, are necessarily encompassed

in the Release and Waiver. Because the counterclaims squarely fit within the Release and Waiver, we conclude the trial court correctly granted Appellees' motion for directed verdict. *See*, *e.g.*, *Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022), *cert. denied*, 143 S. Ct. 2493, 216 L. Ed. 2d 454 (2023) (holding settlement agreement that released " 'any and all claims . . . of whatever kind or character, . . . whether known or unknown,' including, 'without limitation' " specific claims is "the broadest type of general release" and released the claims at issue because they "squarely fit within this release, . . ."); *see also RTKL Assocs.*, 2012 WL 6114887, at *4–5 (same with equally broad release to *Keck* and *Keszler*); *Garza v. Bunting*, No. 05-06-01307-CV, 2007 WL 1545937, at *7 (Tex. App.— Dallas May 30, 2007, no pet.) (same).

## C. The Release and Waiver applies to claims brought against Headwaters Incorporated, Headwaters Windows, and Boral

Finally, we reject Robinson's contention that the Release and Waiver cannot apply to claims against Headwaters Incorporated "or any Boral entity" because Headwaters Windows is the only party named in the Release and Waiver. This argument is contrary to the facts and applicable law.

As a preliminary matter, it is undisputed Headwaters Windows remained the same legal entity after it changed its name to Boral Windows LLC. Robinson presented no evidence to the contrary. A corporate name change does not affect a company's identity, property rights, or liabilities. *See*, *e.g.*, *Ho Wah Genting Kintron Sdn Bhd v. Leviton Mfg. Co.*, 163 S.W.3d 120, 129 (Tex. App.—San Antonio 2005,

–29–

no pet.) (there was "no evidence to controvert [the assertion] that HWG Kintron was 'the same entity' as Kintron Sdn Bhd because the company had merely undergone a name change"); *see also Northern Nat. Gas Co. v. Vanderburg*, 785 S.W.2d 415, 421 (Tex. App.—Amarillo 1990, no writ) (same). The entities are the same for liability purposes. *See Ho Wah Genting Kintron Sdn Bhd*, 163 S.W.3d at 129; *see also Drennan v. Community Health Inv. Corp.*, 905 S.W.2d 811, 818 (Tex. App.—Amarillo 1995, writ denied).

Further, the Release and Waiver applied equally to Headwaters Incorporated and Boral by specifically releasing not just Headwaters Windows but also "all predecessors, successors, assigns, parents, affiliates, and subsidiaries" of Headwaters Windows. Where, as here, a release identifies related entities, it is sufficient to operate to their benefit even if they are not specifically named. *See Stafford v. Allstate Life Ins. Co.*, 175 S.W.3d 537, 543 (Tex. App.—Texarkana 2005, no pet.) ("By its own language, the release signed by Stafford applies to any 'subsidiaries, affiliates, partners, predecessors and successors in interest and assigns' of Allstate Insurance Company."); *see also Quiroz v. Jumpstreet8, Inc.*, No. 05-17-00948-CV, 2018 WL 3342695, at *3 (Tex. App.—Dallas July 9, 2018, pet. denied) (mem. op.) (holding that a release was enforceable by Jumpstreet8, Inc., an affiliate of Jumpstreet, LLC, because "[a]lthough the Release specifically named 'Jumpstreet, LLC,' it also stated the Release equally applied to 'its parent, subsidiaries, affiliates, other related entities, successors, owners, members, directors,

officers, shareholders, agents, employees, servants, assigns, investors, legal representatives and all individuals and entities involved in the operation of Jumpstreet.'"); *see also Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 219 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding that a release and waiver listing "affiliated companies [and] parent companies" sufficiently identified the parent so that the parent was also released).

Robinson relies on two cases to support his argument that the language in the Release and Waiver is insufficient to encompass parties not specifically named in it. *See Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332 (Tex. 2023); *see also Banowsky v. State Farm Mut. Ins. Co.*, 876 S.W.2d 509 (Tex. App.—Amarillo 1994, no writ). Both cases are distinguishable. First, the *Finley Resources* was not tasked with determining whether affiliated companies and parent companies were sufficiently identified to also be released. Nor did the court hold that an entity must be specifically named to be released. Rather, the issue in Finley Resources was whether Finley Resources was released under an agreement that released "predecessors" of a named party but did not name Finley Resources as a "predecessor." 672 S.W.3d at 338–42. The parties disputed whether the term "predecessors" should be narrowly or broadly construed. *Id.* at 340–41. The court concluded the scope of the term "predecessors" in the release was unambiguously narrowed by the related acreage-swap agreement and did not include Finley Resources. *Id.* at 345. In so holding, the court noted its conclusion "does not derive

from any rule requiring releases to be construed 'narrowly' or from a want of 'descriptive particularity.' Instead, it follows from the plain meaning of the term as constrained by the linguistic and grammatical context in which it is used." *Id.*

Here, unlike in *Finley Resources*, the Release and Waiver expressly applied to "all predecessors, successors, assigns, parents, affiliates, and subsidiaries" of Headwaters Windows. It is undisputed Headwaters Windows continued to be directly and wholly owned by Headwaters Incorporated. Robinson knew the corporate relationship between the Headwaters Entities when Headwaters Windows acquired Krestmark, during his employment at Headwaters Windows, at the time of his termination, and when he signed the Release and Waiver. The Release and Waiver is sufficiently descriptive so that even a stranger to the agreement can readily understand and recognize that the release intended to include related entities such as Headwaters Incorporated and Boral.

*Banowsky* is also distinguishable from this case. There, the court concluded a release referencing "all other person, firms, or corporations liable, or who might be claimed to be liable" was not sufficiently descriptive to release an unnamed or unidentified tortfeasor. *Banowsky*, 876 S.W.2d at 513–14. The Release and Waiver here do not suffer from the same infirmity. Under this record, we conclude the Release and Waiver applied to the counterclaims asserted against each Appellee.

**CONCLUSION**

For these reasons, we overrule Robinson's second issue, conclude the counterclaims were released or waived under the Release and Waiver signed by Robinson in 2017, and affirm the order granting the directed verdict on that basis. We need not address Robinson's first and third appellate issues because the directed verdict order may be affirmed on any valid ground. *See* TEX. R. APP. P. 47.1. Accordingly, we affirm the trial court's judgment.


/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

221184F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM E. ROBINSON, JR.,
Appellant

No. 05-22-01184-CV      V.

BORAL WINDOWS LLC F/K/A
HEADWATERS WINDOWS, LLC,
HEADWATERS WINDOWS, LLC
N/K/A BORAL WINDOWS LLC,
AND HEADWATERS
INCORPORATED, Appellees

On Appeal from the 162nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-16397.
Opinion delivered by Justice Partida-
Kipness. Justices Pedersen, III and
Garcia participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees BORAL WINDOWS LLC F/K/A HEADWATERS WINDOWS, LLC, HEADWATERS WINDOWS, LLC N/K/A BORAL WINDOWS LLC, AND HEADWATERS INCORPORATED recover their costs of this appeal from appellant WILLIAM E. ROBINSON, JR.

Judgment entered this 10th day of June 2024.